## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1. My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the state of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2. I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by the law firm of Edelson McGuire, LLC to provide my expert opinions relating to technology described within the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and their claims that Stonebridge Life Insurance Company and Trifecta Marketing Group LLC ("Defendants") violated this act. In particular, I have been asked to determine the technology and methodology used by Defendants to transmit cellular text messages en masse from the cellular telephone number 650-283-0793 to nearly 60,000 cellular telephone subscribers. My opinions in this declaration are based on my education, experience, and training, and my review of the following documents in this case: Plaintiffs' Amended Class Action Complaint; Subpoena to T-Mobile USA, Inc. related to cellular phone bills associated with Defendants; cellular phone bill call detail records ("CDRs") provided by T-Mobile USA, Inc. related to cellular phone bills associated with Defendants; instructions titled How to Read Prepaid Call Records Guide; Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") and regulations promulgated thereunder; the FCC's Report and Order in the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 dated February 15, 2012; and the Appeal from the United

States District Court for the Northern District of California, No. 07-16356, D.C. No. CV-06-02893-CW Opinion, filed June 19th, 2009.

3. I have over 25 years of experience in telecommunications network and system architecture, engineering, design and technology. I consider myself to be an expert in the fields of both wireline and wireless telecommunications networking technology. A copy of my *curriculum vitae* is attached to this declaration. I have been a testifying and consulting expert for more than 30 cases regarding telecommunications technology including nine cases regarding the TCPA and associated regulations.

4. I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers (IEEE), the Personal Communication Society (PCS), and the Cellular Telecommunications and Internet Association (CTIA) as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is a fully accredited national standard of the American National Standards Institute (ANSI). I am the co-author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. These books have sold several thousand copies and were

-2-

**DECLARATION OF RANDALL A. SNYDER**

required reading for wireless engineers at AT&T Wireless and Motorola for several years. The latter book has also been relied upon and cited numerous times as a reference for various patents in the telecommunications industry. I have been granted nine patents myself on telecommunications networking technology and currently have nine additional published patents pending. I have also authored several articles on telecommunications technology and have been quoted numerous times in industry trade publications. I have consulted and been employed for many wireline and wireless telecommunications companies including McCaw Cellular, AirTouch, AT&T Wireless, Lucent, Nokia, Ericsson, Nextwave, MCI, Sprint and other telecommunications technology vendors and service providers. I was also nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in Advanced Media Technology for unique wireless content distribution technology I designed while employed at Entriq, Inc. Still more detail as well as details of publications that I have authored or co-authored within at least the past 10 years are provided in my *curriculum vitae* attached as Exhibit A along with a list of cases where I served as a testifying expert and my standard rate sheet. I am being compensated at the rate of $400 per hour for my study, analysis and testimony in this case.

5.   The TCPA prohibits unsolicited voice and text calls to cellular telephone numbers using an Automated Telephone Dialing System ("ATDS"). Based on my review of the relevant documents and the facts described above, my opinion is that Defendants employed technology that used an ATDS. My opinion is based on the fact that Defendants employed technology that uses an ATDS and used that technology, as

-3-

**DECLARATION OF RANDALL A. SNYDER**

defined in the TCPA and accompanying FCC regulations, with the intention of communicating with nearly 60,000 cellular telephone subscribers without obtaining those subscribers' explicit and express consent to do so.

6. The use of Short Message Service (SMS), more commonly known as "text messaging" in the U.S., is ubiquitous. There are currently more than 330 million wireless subscriber connections in the U.S., according to the Cellular Telecommunications and Internet Association, and more than 193 billion text messages are currently sent each month.

7. SMS is defined as a "peer-to-peer" messaging technology, meaning that it is a communications system and method designed to enable an individual cellular subscriber to send or originate a short text message communication (typically no more than 160 characters) from his or her cellular telephone to another individual subscriber's cellular telephone that is the intended destination of the message, i.e., the message recipient. SMS messages are sent individually from one subscriber to another using cellular telephone numbers as the destination address of the message. The message sender's cellular telephone number is preserved as part of the message at the destination cellular telephone where the message is received so that the message recipient knows the cellular phone number address of the message sender.

8. Many companies have emerged that provide what is known as value-added text messaging services using SMS technology. These companies are technically referred to as Value Added Service Providers ("VASPs") and many of them are external entities to the cellular network operators. These VASPs provide a variety of text messaging services (i.e., SMS) that are not strictly peer-to-peer in the sense of

**DECLARATION OF RANDALL A. SNYDER**

subscriber-to-subscriber; rather, they are companies that use automated computer equipment to send and receive text messages using SMS to and from individual cellular telephone subscribers.

9. These VASPs are typically in the business of creating and operating text message-based applications on behalf of branded or marketing companies that desire to develop and maintain some personalized communication with cellular telephone subscribers. These VASPs have the ability to send large quantities of text messages en masse to subscribers as well as receive individual text messages from those subscribers. Messages sent from a VASP to a cellular subscriber are termed "mobile-terminated" ("MT") and messages sent from a cellular subscriber to a VASP are termed "mobile-originated" ("MO").

10. The automated computer equipment that these VASPs employ is used for a variety of text messaging applications, marketing campaigns and dialogs to communicate with cellular subscribers. Common applications are voting (the most popular example being the text message voting used to vote for contestants on the American Idol television program) as well as receiving mobile coupons, news alerts and sports scores. For applications delivering mobile content via MT messages, the same exact text message is sent to multiple subscribers using their cellular telephone numbers.

11. "Opting-in" is a term that describes a method by which a cellular subscriber explicitly and expressly provides individual consent to inform the VASP that they are willing to receive messages from the VASP for a specific text message application or campaign. Generally, consent is not broadly given for multiple text message applications nor is it given in some "open-ended" fashion (i.e., without limitation)

-5-

**DECLARATION OF RANDALL A. SNYDER**

such that a subscriber can "opt-in" to receive any and all application-based text message traffic.

12. There are many methods by which a cellular telephone subscriber can "opt-in." One common method is a text message response by the cellular subscriber to the VASP based upon some sort of "call to action." For a given application or text message campaign, this "call to action" can be a commercial advertisement from a website, television, radio, newspaper, magazine, billboard, etc. For instance, the actual "call to action" is usually a read or heard message indicating that the cellular subscriber can send a text message to a particular numeric address along with a keyword or words that make up the body of the message. The cellular subscriber uses this MO text message that is sent to the VASP to "opt-in" to the desired application service (such as to receive regular sports updates or to vote for an American Idol contestant).

13. VASPs' connections to the cellular network operators are Internet connections and use a special number as the address by which cellular text messages are sent and received in order to communicate with cellular subscribers. This number is known as a "short code." A short code is a special and unique 5- or 6-digit number that is obtained from an independent agency, Neustar, Inc., that manages and assigns these number resources in the United States on behalf of the cellular network operators. Individual short code numbers are either leased by the VASPs on behalf of the companies for which an application is being run or they can be leased by the branded companies themselves and provided to the VASPs. In either case, the VASPs subsequently request that these numbers be provisioned (i.e., programmatically stored) by the cellular network operators so that MO messages can be properly sent

-6-

**DECLARATION OF RANDALL A. SNYDER**

from cellular subscribers to the correct VASP platform applications. In this case, the cellular network operators always approve the service application that uses an individual short code before it is provisioned in their networks. The process requires that the VASP draft and submit a detailed written description of the service application that uses the short code. The detailed description always contains the actual text content of all messages that are to be sent to and received from cellular subscribers, the precise "opt-in" method to be used by cellular telephone subscribers, the number of cellular telephone subscribers expected to be involved in the application communication, when the application will start and end, along with many other details.

14. Over the past few years, many VASPs have appeared that provide cellular text messaging applications using "long codes" or "long numbers." A long code is an actual dialable cellular telephone number that cellular subscribers can use as the address for which to send MO text messages for a particular text messaging application or marketing campaign. The long code used appears to a cellular telephone subscriber as just another cellular telephone number belonging to someone. In this way, a cellular telephone subscriber can engage in a text messaging application with the owner of the long code, e.g. a VASP, just as they would engage a friend using typical peer-to-peer text messaging. Conversely, MT text messages can be sent from the VASP, or an individual, who owns the long code number to cellular subscribers, making the sender of the message appear to the recipient as just another cellular subscriber.

-7-

**DECLARATION OF RANDALL A. SNYDER**

15. Unfortunately, the VASPs that enable the sending of MT text messages using a long code on behalf of a company wishing to create and operate a mobile text messaging application or campaign, can be exposed to abuse of their platform. These VASPs typically provide a software-based application programming interface ("API") that can be used by their clients to develop a software application and connect to their message delivery platform for that application. This enables the clients to create their own text messaging applications, create the content in the body of the text message and create a schedule for sending the messages via the VASP's platform. These types of applications require no explicit approval from the mobile network operators before they are invoked and run. Furthermore, a software application using the API of the VASP can be created to send out cellular text messages en masse to a list of collected cellular telephone numbers, cellular telephone numbers that are randomly generated or cellular telephone numbers that are generated in sequence. If the numbers are simply generated in sequence, there is no way to tell if the telephone numbers generated are wireline or cellular numbers. If the system attempts to send a cellular text message to a wireline number or an invalid number, an error will be raised, the message is not sent and the originating mobile network of the text message does not record a call for the event. This is why gaps are sometimes seen in call records for the originating long code number for messages sent en masse and in sequential order.

16. It is my understanding that The United States Court for the Ninth Circuit has held that "a text message is a 'call' within the meaning of the TCPA" (*Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion,* June 19th, 2009, p. 7339). Furthermore, the FCC has held that prohibitions under the TCPA apply

-8-

**DECLARATION OF RANDALL A. SNYDER**

equally to both voice and SMS calls to cellular telephone numbers (*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278,* February 15th, 2012).

17. On Tuesday, November 30th, 2010 at 7:48:32 AM, Plaintiff received an unsolicited text message call on her cellular telephone (757-652-3044) from the cellular telephone number 650-283-0793. The content of the text message read: "Thanks 4 visiting our website please call 877-711-5429 to claim your $100 Walmart gift card voucher! Reply stop 2 unsub".

18. Analysis of the call records obtained from T-Mobile USA, Inc. under subpoena show that between November 15th, 2010 and January 31st, 2011, the number 650-283-0793, i.e. the sender of the unsolicited text message call, was registered to an individual named Vincent Montalbano for a pre-paid cellular subscription service provided by T-Mobile USA, Inc.

19. Further analysis of these call records show that starting at 6:22:51 PM on the evening of Sunday, November 28th, 2010 and 3:38:22 PM on the afternoon of Thursday, December 2nd, 2010 (a period of less than five days), 59,568 continuous text message calls were made every three to five seconds from the cellular telephone number 650-283-0793. Each of these text message calls was to a unique cellular telephone number somewhere within the U.S.

20. Furthermore, these text message calls were made to the unique cellular telephone numbers nationwide in ascending sequential order. From the first text call made on November 28th, 2010 at 6:22:51 PM until the 10,355th text call made on November 29th, 2010 at 1:33:43 PM (a period of about 19 hours) the text message calls were sent

-9-

in ascending sequence starting with area code 510 up through area code 757. After that time, a second ascending sequence of text message calls was made to cellular telephone numbers starting with area code 202 up through area code 985. This repeating pattern of text message calls from the cellular telephone number 650-283-0793 to unique nationwide cellular telephone numbers in ascending sequential order continues and repeats until the 59,568th call at 3:38:22 PM on the afternoon of Thursday, December 2nd, 2010. On the days between November 28th, 2010 and Thursday, December 2nd, 2010, there are varying time gaps when text calls were not made, anywhere from about 11:00 PM on one evening until about 4:30 AM or 5:00 AM the next morning. However, once the text calls recommenced, they were always made to cellular telephone numbers in ascending sequential order.

21. Moreover, the call records for the cellular telephone number 650-283-0793 show that 59,568 text message calls from this number were made every three to five seconds over about five days. Since these calls were made in such rapid succession and in a regular and periodic order, they must have been made from a single automated system. It is both implausible and infeasible that multiple automated systems operating separately could perform coincidentally such a regular and ordered communication from a single source address such as the cellular telephone number 650-283-0793. There are also gaps in the ascending and incremental sequence of telephone numbers called, indicating that the single automated system used attempted to increment the value of the last number called, but those calls failed, either because they were wireline telephone numbers or invalid telephone numbers.

-10-

**DECLARATION OF RANDALL A. SNYDER**

22. According to the Telephone Consumer Protection Act, 47 U.S.C. § 227 – Restrictions on use of telephone equipment, the term "automatic telephone dialing system" means equipment which has the capacity to: store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers.

23. In my opinion, and based on the call records provided by T-Mobile USA, Inc., I conclude that the same text message content was either sent to each of the 59,568 cellular telephone numbers or the same message content was sent to each group of numbers whenever the ascending called number sequence was restarted over the five-day period. I make this conclusion because a single automated system must have been used to send these text messages en masse in such rapid succession and in such a brief time period and the text messages were sent in repeated groups of numbers in ascending order. It is inefficient and unlikely that different textual content would be used in the body of each text message sent. It is typical for a common text messaging application to send messages with the same content so the message sender can determine whether the content, or rather the "call to action," is successful or not. Also, if the message content varied, any successful responses would need to be managed based on varying "calls to action" and these different responses would require different application logic to properly manage them, making the application much more complex.

24. Furthermore, it is impossible for a human to have sent these messages individually from a cellular telephone, since the messages were sent every three to five seconds. The automated computer equipment generated 59,568 cellular telephone numbers in ascending sequential order and made text message calls to those numbers as shown

-11-

**DECLARATION OF RANDALL A. SNYDER**

by the call records. Therefore, I also conclude that Defendants employed and utilized an ATDS which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and the capacity to dial such numbers as defined by the TCPA and accompanying FCC regulations.

25.  In summary, it is my expert opinion that Defendants employed and utilized an ATDS which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and the capacity to dial such numbers as defined by the TCPA and accompanying FCC regulations. My opinion is based on the fact that Defendants made 59,568 continuous text calls to cellular telephone subscribers from the cellular telephone number 650-283-0793 to other cellular telephone numbers over the course of five days. Furthermore, these text calls started at 6:22:51 PM on the evening of Sunday, November 28th, 2010 and were made every few seconds until 3:38:22 PM on the afternoon of Thursday, December 2nd, 2010. In addition, each of the text calls made were to cellular telephone numbers in ascending sequential order during the continuous five-day calling period. Moreover, automated equipment without human intervention must have been used to make these calls as it would be impossible for these text calls to have been created and sent individually by a human using a cellular telephone.

26. My opinions in this declaration are based upon extensive experience in the telecommunications industry and a detailed understanding of telecommunications systems within the telecommunications industry. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

**DECLARATION OF RANDALL A. SNYDER**

27. I declare that the foregoing is true and correct subject to the laws of perjury of the United States.

Executed in Las Vegas, Nevada, on this 29th day of August, 2012.

_Randall A. Snyder_

Randall A. Snyder

**DECLARATION OF RANDALL A. SNYDER**

# Exhibit A

## Randall A. Snyder

8113 Bay Pines Avenue, Las Vegas, NV 89128 • (702) 521-7900 • rsnyder@wrsvs.com

**WIRELESS AND CELLULAR TELECOMMUNICATIONS
CONSULTING SERVICES**

Recognized expert in wireless and cellular telecommunications technology, executive manager and leader, designing, developing, marketing and managing mobile telecommunication system and software products.

- Over 25 years' experience specializing in wireless telecommunications technology, network architecture, design, system engineering, marketing and product management.

- Reputable leader and strategic developer with a successful background building startups.

- Skilled presenter, communicator, and educator with success impacting organizational performance, corporate reputation and increasing sales.

- Results-oriented, highly organized and creatively focused on adhering to organizational missions and philosophy while designing best-of-breed mobile technology solutions.

- Extensive travel experience to Asia-Pac, Latin America and Europe supporting engineering, sales and marketing with familiarity with wireless network operators and manufacturers worldwide.

- Several years of wireless standards development with extensive travel throughout Asia-Pac, Latin America and Europe.

- Author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively.

- Author of several articles and taught several seminars on mobile telecommunications technology.

- Hold 18 issued and currently published pending patents on mobile and wireless technology.

- Member of the Mobile Multimedia Institute.

- Nominated for a Technology and Engineering Emmy Award for Outstanding Achievement in Advanced Media Technology in 2006.

- Expert witness and technology consultant; authored over 25 expert reports for patent cases and wireless technology litigation cases.

### CORE COMPETENCIES AND EXPERTISE

| | |
|---|---|
| **Technology:** | Wireless Network Engineering, Design and Architecture, Multimedia Systems, Mobile Internet, Mobile Video, Mobile Marketing, mCommerce and Mobile Payments, Mobile Telecommunications Standards, 3G, LBS, SMS, MMS, WAP, GSM, and ANSI-41 (CDMA) Networking, Signaling System No. 7 (SS7), Communications Protocols, Telephone Consumer Protection Act (TCPA) |
| **Legal:** | Provisional and Patent Applications, Subject Matter Expert Consultant, Expert Witness and Testimony, Litigation Support, Sales and Vendor Contract Negotiations and Review, Qualified as an Expert in Federal District Court |
| **Management:** | Strategic/Tactical Planning, Product Management, Marketing Management, Operations Management, Competitive Analysis, Problem Resolution, Project Planning, Risk Management |
| **Organizational:** | P&L Management, Budget Planning, Expense Reduction and Cost Control |
| **Business Relations:** | Seminars, Sales Presentations and Sales Engineering |

1

## PROFESSIONAL EXPERIENCE

**Wireless Research Services, LLC • Las Vegas, NV • January 2007 – Present**
Mobile Telecommunications Consulting

**President & Founder**
As President and Founder of Wireless Research Services, responsible for consulting business, and revenue as well as being the principal consultant. Areas of subject matter expertise include mobile and cellular networking including TCPA, 3G, GSM, ANSI-41, LBS, SMS, MMS, WAP, SS7, LBS and mobile multimedia systems. With this expertise, primary consulting is in the area of system and product architecture, design, development, management and marketing as well as patent preparation and development, expert reports, expert testimony and litigation support. Authored over 25 expert declarations, affidavits and reports for litigation and patent disputes, depositions and in-court testimony.

**Finsphere Corp. • Bellevue, WA • September 2007 – August 2010**
Mobile Telecommunications and Financial Identity Theft Solutions

**Vice President Product Management & Wireless Engineering**
Among the first handful of employees at Finsphere prior to Series A funding. As vice president of product management and wireless engineering and a member of the executive management team, responsible for product management activities and wireless technology solutions for Finsphere's products. These products encompass mobile location based software-as-a-service (SaaS) products offered primarily to financial institutions and banks. Responsibilities include product requirements and system functionality, strategic planning, R&D of new technologies, wireless network interconnectivity as well as wireless technology for Finsphere's products. Also responsible for market strategies, white papers and development and management of intellectual property and patent applications.

**Entriq, Inc. • Carlsbad, CA • May 2004 – April 2007**
Mobile Pay Media Solutions and Services

**Vice President Product Management**
As vice president of product management and a member of the executive management team, responsible for the entire product management team and system architecture for Entriq's products and services. Products encompassed mobile and broadband pay media applications (specializing in video), digital rights management (DRM) and security solutions, e-commerce and m-commerce systems as well as ad management and delivery solutions for both broadband and mobile media services. Responsibilities also included network and protocol analysis, market analysis, evaluation of third-party software and services, all vendor contract negotiations, RFP responses and overall administrative responsibility for the entire product line. Responsible for directing and managing the technical writing department producing all user documentation associated with the products. Nominated for a National Television Arts and Sciences Emmy Award for Outstanding Achievement in Advanced Media Technology for unique mobile technology designed, developed and commercially deployed as part of Entriq's solution.

**m-Qube, Inc. (acquired by Verisign) • Boston, MA • February 2002 – November 2003**
Mobile Marketing Solutions and Services

**Vice President Product Management and Carrier Marketing**
As vice president of product management and carrier marketing for m-Qube, responsible for the entire product management and carrier marketing teams, member of the executive management team and one of the founders. Responsible for all product management, system engineering and product strategy for all business conducted with the wireless industry and carriers. In charge of the market strategy and wireless network architecture for m-Qube's mobile marketing service, a value-added service offering mobile marketing solutions to wireless carriers using short message services (SMS) for GSM and CDMA networks. The service architecture enabled branded companies to deploy promotional marketing and messaging campaign dialogs with mobile subscribers via SMS. The network architecture required definition and design of all aspects of the overall network including SMS technology, interconnectivity to the wireless carriers, signaling, traffic management, market requirements for features and services, network equipment specifications and OA&M.

**Bitfone Corporation • Mountain View, CA • April 2001 – February 2002**
Mobile Internet Solutions

**Vice President Product Management and Marketing**
As vice president of product marketing for Bitfone and a member of the executive management team, responsible for the entire product management team and all of the company's product definitions, strategies and positioning. Direct responsibility for market and product requirements, market research, competitive analysis, product strategy and sales strategy. Bitfone's products included the iBroker, a mobile Internet technology infrastructure platform to enhance WAP, MMS, mobile e-mail and wireless messaging. Also responsible for the mProve product (obtained via merger with Digital Transit, Inc.) providing over-the-air firmware and software update technology to mobile devices.

**Openwave Systems (via merger of Phone.com and Software.com) • Redwood City, CA • November 2000 – April 2001**
Mobile SMS, MMS, WAP Solutions

**Executive Director Emerging Technologies**
As executive director of emerging technologies for Openwave Systems, responsible for new 3G technologies and providing market and product plans for those technologies for the entire product line. Primary responsibility for the 3GPP Multimedia Messaging Service (MMS), collecting market requirements from customers, developing corporate strategy for MMS and preparing the organization for additional development of the product. In addition, taught wireless technology classes to the different departments at Openwave and educated them on wireless service provider strategies and network technologies.

**@Mobile and Software.com (via acquisition) • Santa Barbara, CA • March 2000 – November 2000**
Mobile Messaging Solutions

**Director Wireless Product Management**
As director in charge of Software.com's new wireless products group (via acquisition of @Mobile), responsible for the product managers and for all of the wireless internet infrastructure products. Responsibilities include the overall market and product strategy for Software.com's wireless e-mail, short message service, instant messaging and unified messaging products. Responsible for the overall revenues generated from these products based on detailed product plans and internal organizational planning. Much of his time was spent working with the executive management team and the sales directors on corporate market strategy.

**FreeSpace Communications, Inc. • Palo Alto, CA • December 1999 – March 2000**
Wireless Network Architecture

**Consulting Network Systems Engineer**
As an engineering consultant, responsible for the complete design of the backbone network architecture for a new broadband fixed wireless data network. This new architecture incorporates DSL as the backbone network technology. The network architecture requires definition and design of all aspects of the overall network plan including DSL technology, IP technology, ATM technology, interconnectivity to the PSTN, operations signaling, traffic engineering, market requirements for network features and services, network equipment specifications and OA&M.

**Synacom Technology, Inc. • San Jose, CA • December 1998 – December 1999**
Mobile Network Infrastructure Solutions

**Executive Director Product Marketing and Management**
As Executive Director of Product Management and Marketing for Synacom, responsible for managing the entire product management and marketing department of Synacom Technology, including market research and planning, product management and market communications. Lead the entire design, definition and product direction of all aspects of Synacom's products.

3

**Synacom Technology, Inc. • San Jose, CA • August 1997 – December 1998**
Mobile Network Infrastructure Solutions

**Director Systems Engineering**
As Director of Systems Engineering for Synacom, responsible for coordinating and managing the overall functional and requirements specifications for all Synacom's products as well as the detailed test plans used for alpha system testing of those products. Also responsible for directing and managing the technical writing department producing all of the user documentation associated with all of the products. Provided the primary sales engineering support for sales and marketing and was involved in nearly every aspect of the product lifecycle.

**Synacom Technology, Inc. • San Jose, CA • November 1996 – August 1997**
Mobile Network Infrastructure Solutions

**Director Consulting Services and Principal Engineer**
As Director of Consulting Services and Principal Engineer for Synacom Technology, Inc., responsible for obtaining, coordinating and managing all technical consulting projects performed by the company. These projects included wireless network architecture and design for both IS-41 and GSM networks for dozens of client companies (carriers and equipment manufacturers). In this role, continued as a member of both the ANSI/TIA TR45.2 Subcommittee for cellular radio intersystem operations standards and the ANSI/TIA TR46 Committee for 1900 MHz GSM PCS standards. Major contributor to TR46 in the area of GSM-to-IS-41 network interworking. Also authored, edited and published TIA standard specification IS-93 for cellular network interconnections to the PSTN and ISDN.

**Synacom Technology, Inc. • San Jose, CA • April 1992 – November 1996**
Mobile Network Infrastructure Solutions

**Principal Engineer**
As the principal engineer for Synacom Technology, was lead engineer for many consulting projects. Consulted for McCaw Cellular, AT&T Wireless, AirTouch Cellular, AirTouch Satellite Services, Globalstar, Nokia, MCI, Sprint PCS, XYPoint, NextWave, NewNet American Personal Communications, CTIA and several other national and international wireless telecommunications companies.

Wrote wireless network design and analysis papers including HLR specifications, Authentication Center specifications, PCS network design, short message service (SMS) design, intelligent network applications of wireless technology and in-house expert in signaling protocols. Extensive experience with Signaling System No. 7, including both protocol implementation and design. Authored the Standard Requirements Document for the SS7-based A-interface between the base station and MSC used throughout the TIA. Also involved in the design of the Bellcore WACS/PACS technology, digital cellular network service and feature descriptions, SCPs and HLRs. Extensive experience developing the architecture and design of distributed intelligent networks including, SS7, cellular, PCS, AIN and WIN networks. Key member of the original Cellular Digital Packet Data (CDPD) architecture and design team. Designed the CDPD air interface protocol emulator developed and marketed by AirLink Communications, Inc.

**AT&T Bell Laboratories • Whippany, NJ • December 1990 – April 1992**
Mobile Network Architecture Solutions

**Consulting Member of the Technical Staff**
As a consultant to AT&T Bell Laboratories, evaluated wireless technology services for the Wireless Systems Architecture group. Also participated as a system engineer on the design of the Global System for Mobile (GSM) communication architecture and a software engineer developing the base station controller (BSC) for GSM. Also responsible for planning, coordinating, designing and testing the SS7 protocol software for the GSM A-interface between the BSC, MSC and operations and maintenance center (OMC). High-level and detailed design specifications were developed to coordinate the protocol testing between two remote laboratories. Provided the traffic analysis and traffic engineering of call traffic for the BSC. Specifically designed and developed the dynamic traffic overload control subsystem for the BSC. Presentations were given to technical staffs at multiple Bell Laboratories facilities supporting this work.

**DGM&S, Inc. • Mt. Laurel, NJ • May 1987 – December 1990**
Telecommunications Network Infrastructure Solutions

**Senior Staff Consultant**
As a Senior Staff Consultant, responsible for the design, development and test coordination of an advanced intelligent network applications platform for a service control point (SCP). Also spent several years as a consulting software engineer for Siemens AG, developing and testing SS7 and call control software for the EWSD digital switching system for international as well as U.S. national network implementations. This work involved extensive travel to both Frankfurt and Munich, Germany for software system design and testing. Also involved in the concept, design and technical marketing of proprietary enabling technology software products for SS7 and ISDN.

**ADP, Inc. • Mt. Laurel, NJ • May 1986 – May 1987**
Financial and Brokerage Solutions and Services

**Senior Software Engineer and Analyst**
As a Senior Software Engineer for ADP, Inc., responsible for the design and development of data communications and real time database application software for a host data center that provided real time financial information to large brokerage houses. Data communication protocol expertise in HDLC, RS-232 and IBM BiSync.

**C3, Inc. • Cape May, NJ • June 1984 – May 1986**
U.S. Coast Guard Shipboard Software Consulting Solutions

**Consulting Systems Analyst and Software Engineer**
As a civilian consulting systems analyst and engineer to the U.S. Coast Guard Electronics Engineering Center (EECEN) for C3, Inc., developed sophisticated user-friendly database software for shipboard use including inventory and law enforcement applications. The work included the follow-through of the entire project lifecycle including writing of requirements, functional, design and program specifications, coding, debugging, alpha and beta testing, release, shipboard installation and continuing technical support of the product. Received a personal commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, for successful efforts on these projects.

## EDUCATION

B.A. Mathematics (Astronomy Minor)
Franklin and Marshall College 1984

## PATENTS ISSUED

System and Method for Authenticating Cellular Telephonic Communication, US Patent #5799084, Issued August 25, 1998.

Authentication Key Management System and Method, US Patent #5850445, Issued December 15, 1998.

Secure Authentication-Key Management System and Method for Mobile Communications, US Patent #5970144, Issued October 19, 1999.

Authentication Key Management System and Method, US Patent #6128389, Issued October 3, 2000.

System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System. US Patent #7403788, Issued July 22, 2008.

System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System. US Patent #7792518, Issued September 7, 2010.

System and Method for Mobile Identity Protection of a User of Multiple Computer Applications, Networks or Devices. US Patent #8116731, Issued February 14, 2012.

System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System. US Patent #8131262, Issued March 6, 2010.

Mobile Messaging Short Code Translation and Routing System and Method. US Patent #8155677, Issued April 10, 2012.

## PUBLISHED PATENTS PENDING

Method and System to Automatically Publish Media Assets. USPTO Patent Application Publication #20060224943, October 5, 2006.

Centralized Mobile and Wireless Messaging Opt-Out Registry System and Method. USPTO Patent Application Publication #20080114884, May 15, 2008.

Wireless Messaging Address System and Method. USPTO Patent Application Publication #20080119210, May 22, 2008.

Method for Tracking Credit Card Fraud. USPTO Patent Application Publication #20080227471, September 18, 2008.

System and Method for Wireless Device Based User Authentication. USPTO Patent Application #20090204815, August 13, 2009.

System and Method for Determining and Delivering Appropriate Multimedia Content to Data Communication Devices. USPTO Patent Application #20100041380, February 18, 2010.

System and Method for Identity Protection Using Mobile Device Signaling Network Derived Location Pattern Recognition. USPTO Patent Application #20100130165, May 27, 2010.

Systems and Methods for Authenticating a User of a Computer Application, Network or Device Using a Wireless Device. USPTO Patent Application #20110154447, June 23, 2011.

System and Method for Improving Internet Search Results Using Telecommunications Data. USPTO Patent Application #20110202407, August 18, 2011.

## PUBLICATIONS

IS-41/GSM Interoperability by Randy Snyder; December, 1995, Cellular Networking Perspectives, Cellular Networking Perspectives, LTD, Calgary, Alberta, Canada.

Gallagher, Michael D. and Snyder, Randall A. Mobile Telecommunications Networking with IS-41; McGraw-Hill, New York, NY USA; © Copyright 1997 Michael D. Gallagher and Randall A. Snyder.

Forecasting SS7 Traffic by Randall A. Snyder; November 1, 2000. Wireless Review, Volume 17, Number 21, Intertec Publishing, Overland Park, KS USA.

Snyder, Randall A. and Gallagher, Michael D. Wireless Telecommunications Networking with ANSI-41 Second Edition; McGraw-Hill, New York, NY USA; © Copyright 2001 Randall A. Snyder and Michael D. Gallagher.

What Workers Want from Wireless by Randall A. Snyder; April 15, 2004. America's Network, Advanstar Communications, Santa Ana, California USA.

## CITATIONS

Method and Apparatus for Routing Short Messages, US Patent #6308075, Issued October 23, 2001.

Mediation Software for Delivery of Interactive Mobile Messaging and Personalized Content to Mobile Devices. Patent Application # 20020120779, August 29, 2002.

Automatic In-Line Messaging System, US Patent #6718178, Issued April 6, 2004.

Method and System for Wireless Instant Messaging, US Patent #7058036, Issued June 6, 2006.

United States Court of Appeals for the Ninth Circuit. *Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion*. Appeal from the United States District Court for the Northern District of California. Opinion by N.R. Smith, Circuit Judge. Filed June 19, 2009.

Wireless Research Services, LLC
Case List – August 2012

**Wireless Research Services**

# Randall A. Snyder – Expert Case List

| CASE | ROLE |
|------|------|
| Abrams v. Facebook, Inc. | Testifying Expert |
| Albrecht v. Verisign et al. | Testifying Expert |
| Annoni v. FYISMS | Testifying Expert |
| Ayers v. Media Breakaway | Testifying Expert |
| Bailey v. HSBC | Testifying Expert |
| Bradberry v. T-Mobile USA | Testifying Expert |
| Cricket v. HipCricket | Testifying Expert |
| Criswell v. MySpace | Testifying Expert |
| Dobbins v. Wells Fargo | Testifying Expert |
| Griffith v. CPS | Testifying Expert |
| Intellectual Ventures v. AT&T Mobility | Testifying Expert |
| Keim v. ADF (Pizza Hut) | Testifying Expert |
| Reed v. Sprint Nextel Corp. | Testifying Expert |
| Rynearson v. Motricity, Inc. | Testifying Expert |
| Satterfield v. Ipsh! and Simon & Schuster | Testifying Expert |
| TeleCommunication Systems, Inc v. Mobile365, Inc. | Testifying Expert |
| Tipoo v. Enhanced Recovery Company | Testifying Expert |
| Vandyke v. Media Breakaway | Testifying Expert |
| Walker v. Motricity, Inc. | Testifying Expert |

*Wireless*
*Research*
*Services*

Wireless Research Services, LLC
Rate Sheet January 1, 2012

# Wireless Research Services, LLC

## 2012 Rate Sheet

| ITEM | FEE |
|---|---|
| Expert Witness Consulting, Reports, Depositions | $400 per hour |
| In-court Testimony | $450 per hour |
| Required Travel, Lodging, Board and Administrative Expenses | Billed at Actual Cost<br>No Charge for Idle Travel Time |
| Retainer at Time of Engagement | $2,500 |