1  Sean Reis (SBN 184044)
2  sreis@edelson.com
   Edelson McGuire, LLP
3  30021 Tomas Street, Suite 300
   Rancho Santa Margarita, California 92688
4  Tel: 949.459.2124
   Fax: 949.459.2123
5
6  Attorney for Plaintiff
   JESSICA LEE
7  [Additional counsel appear on signature page]

8                    UNITED STATES DISTRICT COURT
9                  NORTHERN DISTRICT OF CALIFORNIA

10
   JESSICA LEE, individually and on behalf of a      Case No. CV 11-0043-RS
11 class of similarly situated individuals,

12                    Plaintiff,

13            v.                                       **PLAINTIFF'S REPLY IN SUPPORT OF
                                                       HER MOTION FOR CLASS
14 STONEBRIDGE LIFE INSURANCE                          CERTIFICATION**
   COMPANY, a Vermont corporation, and
15 TRIFECTA MARKETING GROUP, LLC, a                   Judge:  Hon. Richard Seeborg
   Florida limited liability company,                 Magistrate: Hon. Joseph C. Spero
16
17                    Defendants.                      Date:  November 1, 2012
                                                       Time:  3:30 p.m.
18                                                     Courtroom: 3, 17th Fl.
                                                       Judge: Hon. Richard Seeborg
19
20
21
22
23
24
25
26
27
28

---

PL'S REPLY IN SUPPORT OF CLASS CERT.                                    CV-11-00043-RS

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................1

**ARGUMENT** ......................................................................................................2

    **I.**    **Stonebridge Mischaracterizes the Facts of this Case** ........................2

        **A.**    **The Content of the Text Message Alleged By Plaintiff Has Never Changed** ................................................................2

        **B.**    **Plaintiff Promptly Took Steps to Preserve the Content of the Text Message She Received** ...........................................3

        **C.**    **The Evidence in this Case Links Stonebridge to the Text Messages at Issue** ............................................................4

    **II.**    **Common Questions Predominate Over Individual Issues** ..................6

        **A.**    **Stonebridge's Liability Is Determined Based on Examination of Its Own Conduct** ...............................................7

        **B.**    **Whether an ATDS Was Utilized in this Case Is a Common Question** ...............................................................9

        **C.**    **Stonebridge's Argument about "Individualized Issues" of Consent Is a Red Herring** ..........................................9

    **III.**    **Plaintiff Jessica Lee Satisfies the Typicality and Adequacy Requirements** ...12

        **A.**    **An Adverse Inference Is Unwarranted in this Situation** ....................12

        **B.**    **Plaintiff's Friendship with an Attorney at Plaintiff's Law Firm Is Insufficient to Render Her Inadequate** ..........................13

    **IV.**    **Plaintiff's Class Definition Is Proper** ............................................14

**CONCLUSION**...................................................................................................15

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases:**

*Erica P. John Fund, Inc. v. Halliburton*, 131 S. Ct. 2179 (2011).....................................7

*Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740 (2012)....................................................7

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .................................................8

**United States Circuit Court of Appeals Cases:**

*London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003) ........................................13

*Meyer v. Portfolio Recovery Associates*, -- F.3d ---, 2012 WL4840814 (9th Cir. Oct. 12, 2012) ..........10

*Oshana v. Coca-Cola Co*, 472 F.3d 506, 514 (7th Cir. 2006)................................................15

*Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946 (9th Cir. 2009) ........................................7, 11

**United States District Court Cases:**

*Apple Inc. v. Samsung Elec. Co., Ltd.*, 11-CV-01846-LHK,
    2012 WL 3627731 (N.D. Cal. Aug. 21, 2012) ..................................................................12

*Ferrone v. Onorato*, CIV.A. 05-303, 2007 WL 2973684 (W.D. Pa. Oct. 9, 2007) ..............................12

*Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419 (N.D. Cal. 2011) ............................................12

*Herrera v. LCS Fin. Services Corp.*, 274 F.R.D. 666 (N.D. Cal. 2011).......................................14, 15

*Hinman v. M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152 (N.D. Ill. 2009) ..................................7

*Imhoff Inv. v. SamMichaels LLC*, No. 10-10996, 2012 WL 4815090 (E.D. Mich. Oct. 1, 2012)..........12

*In re Jiffy Lube Inter., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012)...........................7

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006).......................................13

*In re TFT–LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291 (N.D. Cal. 2010)...................................14

*Kemblesville HHMO Ctr., LLC v. Landhope Realty Co.*, CIV.A. 08-2405,
    2011 WL 3240779 (E.D. Pa. July 28, 2011)................................................................15

*Kesler v. IKEA*, SACV 07-568 JVS RNBX, 2008 WL 413268 (C.D. Cal. Feb. 4, 2008) ....................13

*Kramer v. Autobytel, Inc,* 759 F. Supp. 2d. 1165 (N.D. Cal. 2010) ................................7

*O'Connor v. Boeing N. Am. Inc.,* 184 F.R.D. 311 (C.D. Cal. 1998) ............................... 14

*Serna v. Big A Drug Stores, Inc.*, 2007 U.S. Dist. LEXIS 82023 (C.D. Cal. Oct. 9, 2007)................... 13

*Silbaugh v. Viking Magazine Services, Inc.*, 278 F.R.D. 389 (N.D. Ohio 2012)...........................11

*Thomas v. Taco Bell Corp.*, -- F. Supp. 2d ---,
    2012 WL 3047351 (C.D. Cal. June 25, 2012) ................................................7

*Thrasher-Lyon v. CCS Comm. LLC*, 2012 WL3835089 (N.D. Ill. Sept. 4, 2012) ................................11

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229 (S.D. Ill. 2011) ........................11

**United States State Court Cases:**

*Am. Home Services, Inc. v. A Fast Sign Co., Inc.*, 287 Ga. App. 161 (2007) ........................11

*Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468 (Ga. Ct. App. 2000) ..........................8

*Leavitt v. Fax.com,* No. 05-949, 2007 WL 316978 (D. Md. May 25, 2007)................................11

**Statutory Provisions:**

Fed. R. Civ. P. 23................................................................................7, 14, 15

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ............................................. *passim*

**Miscellaneous Authorities:**

*Brief for the Federal Communications Commission and the United States as Amici Curiae,*
    *Charvat v. Echostar Satellite, LLC*, No. 09-4525, 2010 WL 7325986 (Oct. 15, 2010) ......8

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
    Memorandum Opinion and Order, 100 FCC Rec 12391, 12397 (1995) ...........................8

**INTRODUCTION**

Stonebridge's Opposition to Plaintiff's Motion for Class Certification consists of a dizzying array of arguments designed to confuse rather than inform the Court.  Stonebridge spends much of its opposition making merits-based arguments that it cannot be held responsible for the text message transmissions in this case.  These "summary judgment" arguments, besides being incorrect, are premature; merits discovery is not yet open and Stonebridge has blocked access to discovery on merits issues by refusing to produce witnesses and threatening to move for protective orders to prevent key depositions.  The relevant inquiry for class certification, however, is whether Stonebridge's liability under the TCPA should be determined on a class-wide basis.  Because Stonebridge's liability depends on its own knowledge and control over the marketing activities at issue here, the answer to that question is yes.

Plaintiff seeks to represent an identifiable group of 59,568 consumers that received text messages sent from a single, identical "longcode" in a rapid fashion over the course of four days using a single computer interface.  The evidence shows that these text messages were transmitted to generate inbound calls to Trifecta's call center, where Trifecta was contractually obligated to generate leads for Stonebridge.  As expert witness Randall Snyder testified, to have a text message blast such as this for multiple, unrelated advertising campaigns would be "inefficient, implausible, [and] infeasible."

Perhaps most egregious are Stonebridge's attempts to paint the Plaintiff Jessica Lee as an untrustworthy individual with ulterior motives.  The actual <u>evidence</u> in this case, however, dispels these specious attacks and shows Ms. Lee to be an excellent class representative who has fulfilled all of her obligations and consistently put the class members' interests ahead of her own.

Stonebridge's (and Trifecta's) liability should be resolved on a class-wide basis.  The text messages were transmitted from a single computer interface in furtherance of the marketing agreement between Trifecta and Stonebridge.  Defendants' liability will be established based on their own level of knowledge and control over the transmissions.  All of the putative class members suffered the same injury and possess identical claims under the TCPA, which became ripe upon <u>transmission</u> of the text messages. It is cases like this that beg for resolution on a class-wide basis.

**ARGUMENT**

**I.     Stonebridge Mischaracterizes the Facts of this Case**

Stonebridge attempts to perpetrate three (primary) myths in this case to distract the Court from the relevant issues surrounding class certification: (1) that Plaintiff has no evidence of the content of the text message she received; (2) that Plaintiff committed spoliation by not preserving the text message; and (3) that there is no evidence connecting Stonebridge to these text messages. Unfortunately for Stonebridge, the actual facts in this case expose the flaws in its theories and highlight its desperation.

**A.     The Content of the Text Message Alleged By Plaintiff Has Never Changed**

Stonebridge's first and most disingenuous argument is that there are "three versions" of the text message received by Plaintiff. (*See* Defendant's Opposition to Plaintiff's Motion for Class Certification ("Def.'s Opp."), at § A.1). What Stonebridge attempts to obscure, however, is that the content of the text message throughout this whole litigation has remained <u>identical</u>. Still, Stonebridge persists in repeating *ad nauseum* that there are "three versions" of the text message, while glossing over the fact that they are actually quibbling over the mere capitalization of otherwise identical words and letters.[1]

Plaintiff provided a verified interrogatory answer to Defendant that states the language of the text message she received. (Dkt. 69-1, Ex. 16 at 87.) Moreover, and described in Section I.B. *infra*, Plaintiff immediately preserved a copy of the text message she received by sending it to counsel, who then saved a copy of the message. Stonebridge makes much of the fact that, at her deposition, Plaintiff could not recall the exact content of the text message she received, or the exact date she received it, nearly two years after receipt. (Def.'s Opp. at 2.) It is not necessary for Plaintiff to memorize the allegations in her Complaint, however, when she has preserved the records, and when documentary evidence otherwise proves her case. Stonebridge's attempt to use this issue to label the Plaintiff as "untrustworthy" is completely transparent and manufactured. (Def.'s Opp. at 13.)

---

[1] When Plaintiff's counsel drafted the Complaint, they made a stylistic choice to center the language of the text message and place it in all capital letters to emphasize the language of the text message and ensure that it was separate from the surrounding words.

**B.    Plaintiff Promptly Took Steps to Preserve the Content of the Text Message She Received**

The second myth Stonebridge perpetrates is that the Plaintiff did not receive this text message <u>at all</u>, and even if she did, that she failed to take steps to preserve evidence proving the receipt and content of the text message. Stonebridge goes so far as to accuse the Plaintiff of intentional destruction of evidence. The facts, however, get in the way of this argument, as Plaintiff specifically testified that she forwarded the offending text message to her lawyers after she received it. (Deposition of Jessica Lee ("Lee Dep."), attached to the Declaration of John C. Ochoa ("Ochoa Decl.") as Ex. 5, at ¶ 13, at 41:13-24; 43:11-13; 17-21.) In fact, Lee repeatedly testified that she forwarded this text message to her lawyers shortly after receipt. (*See, e.g.,* Lee Dep. at 47:14-19 (Q: Any reason why you think - - why you're assuming that it's the exact number? A: Just the same as before as the text message because I forwarded it directly to my lawyers and I assume it's the exact same thing that I forwarded to them.").

Discovery confirms Plaintiff's testimony. According to Plaintiff's telephone bills, she received a text message from phone number "650-283-0793" at exactly 10:48 a.m. EST on November 30, 2010. (Dkt. 78-14, Ex. 14, at line 3777 (filed under seal)). This corresponds with the T-Mobile list, which shows transmission of an outbound text message to Plaintiff's cellular telephone number at 7:48 a.m. PST on November 30, 2010. (Dkt. 78-10, Ex. 9 (filed under seal)). Further, and consistent with her testimony that she forwarded the message "directly to my lawyers," Plaintiff's telephone bills show that a text message was forwarded to Mr. Givens, an attorney at Edelson McGuire, exactly one minute after receipt. (Dkt. 78-14, Ex. 14, at line 3778 (filed under seal)). Approximately 10 minutes after being forwarded the text message, Mr. Givens emailed a copy of the text message from his phone to his email account so that the exact content of the message, along with the transmission telephone number, would be preserved. (Declaration of Chandler Givens ("Givens Decl."), ¶¶ 3-4.) This record is attached.[2] As such, Lee preserved the content of the text message literally <u>one minute</u> after receipt, her telephone bills confirm this,

---

[2]   The email from Mr. Given's cellular telephone to his email account is arguably attorney-work product, but Plaintiff nevertheless offered to provide a declaration proving chain of custody, and later, the email itself, to Stonebridge. (Ochoa Decl. ¶ 2.) Stonebridge, not wanting the facts to get in the way of its manufactured theory, never took Plaintiff up on her offer, and insisted on nothing less than the drastic step of deposing an attorney at Plaintiff's law firm. (*Id.*)

1  and Defendant's arguments to the contrary are nothing more than a contrived smear campaign.[3]

2  **C.    The Evidence in this Case Links Stonebridge to the Text Messages at Issue**

3  Stonebridge spends an inordinate amount of time presenting a smattering of merits-based

4  arguments that are both misleading and improper at this stage of the litigation.  What Stonebridge fails to

5  mention is that *the parties specifically agreed to stay merits discovery in their joint case management*

6  *statement*, and this Court's scheduling order only set class certification discovery deadlines – not merits

7  discovery deadlines – in advance of Plaintiff's Motion for Class Certification.  (*See* Dkts. 23 & 25.)

8  Stonebridge has also blocked Plaintiff's access to witnesses with relevant merits information, including

9  Joseph Montalbano, on the basis that merits discovery is not yet open.[4]  Despite this, Plaintiff has still

10  obtained evidence that more than adequately links Stonebridge to the text messages here.  Not only that,

11  testimony elicited at the deposition of Alois Rubenbauer, President of Trifecta, shows that Stonebridge had

12  the right to control Trifecta's marketing activities.

13  The text message received by Lee and the putative class members all contained a toll-free telephone

14  number that connected to Trifecta's call center in Pinellas Park, Florida.  As set forth in Plaintiff's opening

15  brief, Trifecta was contractually obligated to generate leads for Stonebridge during the time period that the

16  text messages in this case were transmitted.  (Dkt. 69, at § 3.A.)  Trifecta then contracted with various third-

17  parties to physically transmit text messages containing toll-free telephone numbers licensed by Trifecta.

18  (Deposition of Alois Rubenbauer ("Rubenbauer Dep."), attached to Ochoa Decl. as Ex. 8, at ¶ 16, at 51:4 –

19  52:9, 67:7-18; Dkt. 69-1, Exs. 5-7.)[5]  When consumers called those toll-free numbers, they were connected

20  to Trifecta's call center, where they were pitched four products, including those of Stonebridge.[6]  There is

21  only one reasonable explanation for the text messages here—that they were sent on behalf of Defendants to

---

22  [3] Plaintiff also testified the text message she received promoted a "wal-mart" gift card, and contained a toll-
free telephone number.  (Lee Dep. 42:12 – 43:7; 46:15-22.)

23

24  [4] Stonebridge has gone out of its way to block any effort by Plaintiff to obtain merits-based discovery.  For
example, Stonebridge threatened to move for protective orders unless Plaintiff withdrew subpoenas for Joseph
Montalbano's deposition, as well as Stonebridge employees with knowledge of the marketing campaign

25  undertaken with Trifecta, on the basis that merits discovery is not yet open.  (Ochoa Decl. ¶ 3.)

26  [5] Rubenbauer testified that the text message alleged in the Complaint "looks similar to something that was
sent out" and approved by Trifecta.  (Rubenbauer Dep. 110:14-19.)

27  [6] The evidence gathered shows that Trifecta was also offering "gift cards,", the magazine *US Weekly*, and
the products of a company called Sybase on inbound calls along with Stonebridge products.  (Ochoa Decl. ¶ 4.)

28

---

further their telemarketing scheme.

The T-Mobile List shows that during a four-day period, a single "longcode" transmitted 59,568 text messages to consumers.  (Declaration of Randall Snyder ("Snyder Decl."), Dkt. 69-2, ¶ 21.)[7]  As demonstrated above, the text message received by Jessica Lee from this number contained a toll-free telephone number, licensed by Trifecta, which connected to Trifecta's call center.  (*See* § I.A *supra*).  Although common sense dictates that 59,568 text messages transmitted in rapid fashion over a four-day period were done as part of a common course of conduct, the expert opinion of Randall Snyder, and accompanying testimony, cement this conclusion.  Mr. Snyder, who has been personally involved in hundreds of text message marketing campaigns, founded one of the first mobile marketing companies, and who helped found and establish guidelines for the Mobile Marketing Association, testified that it would be "inefficient, implausible, [and] infeasible" for the text messages transmitted here to have been part of totally unrelated campaigns.  (Deposition of Randall Snyder ("Snyder Dep.") attached to Ochoa Decl. as Ex. 6, at ¶ 14, 145:15 – 146:9.)[8]  More than this, the "regular pattern of calls," and rapid transmission of messages, made it highly unlikely the content of the messages changed.  (Snyder Dep. 190:6-22; 150:2-13.)

Stonebridge's arguments regarding the identity of Joseph Montalbano are premature, as they go directly to merits issues.  Regardless, Montalbano's identity need not be determined now since other evidence connects these text messages to the marketing scheme enacted by Trifecta and Stonebridge, not the least of which is Trifecta-controlled toll-free telephone numbers appearing in the text messages.  And the fact that Trifecta's President does not recall Montalbano is of no moment—Rubenbauer conveniently remembered very little at his deposition and specifically testified that he cannot recall the names of all the entities Trifecta hired to transmit text messages.  (Rubenbauer Dep., 114:9-15.)

Although the foregoing facts connect Stonebridge to the marketing activities of Trifecta and

---

[7] Out of an abundance of caution, after Plaintiff obtained the call detail records in the *Hubbard* case, she issued a subpoena out of *this* case for the records, and received an identical list.  (*Id.* ¶¶ 5-6.) And Stonebridge's arguments as to the case *Hubbard v. Wenner Media LLC*, No. 11-cv-4648 (N.D. Cal.), are confusing and, ultimately, irrelevant, as those plaintiffs are not class members here.  (Ochoa Decl. ¶ 7.)

[8] Snyder's deposition testimony, which explains his conclusions concerning the use of a single computer program to transmit these messages, as well as the conclusions concerning the content of the messages, is reviewed in detail in Plaintiff's Response to Defendant Stonebridge Life Ins. Co.'s Evidentiary Objections, dkt. 85, specifically at Response Nos. 5, 10, 11 & 12.

1  demonstrate a "common course of conduct," Stonebridge's liability for violations of the TCPA <u>does not</u>

2  <u>depend</u> on Stonebridge being pitched on every inbound call, but rather on the more narrow question of

3  whether Stonebridge can be vicariously liable for how Trifecta generated inbound calls (i.e., via text

4  message).  As explained in Section II *infra*, the answer to this question can be answered commonly for all

5  class members.  Nevertheless, testimony from Trifecta's President about Stonebridge's level of control,

6  elicited by Stonebridge itself, shows that Stonebridge <u>did</u> have the requisite control over Trifecta's

7  marketing activities:

8     Q:  Did Stonebridge control or have the right to control how Trifecta generated inbound
          calls?

9     A:  Yes.

      Q:  All right.  And let's just break that—that down a little bit.  Now, when you talk about
10        inbound calls, are you just talking about the fact that what—well, let's –let's be very
          specific.  To the extent that Stonebridge had any control, is it—is it contained just
11        within what's in the call-back agreement?

12    A:  No.
                                    *       *       *

13    Q:  And did Stonebridge—for example, if Stonebridge had told you not to ever market
          through radio, would Trifecta have been required to follow those instructions?

14    A:  Yes.

15  (Rubenbauer Dep. 102:24 – 103:8; 103:19-22.)  In sum, Rubenbauer's testimony that Stonebridge could

16  control Trifecta's marketing activities, and that this control extended beyond the terms of the Call-Back

17  Agreement, stands <u>in</u> <u>complete</u> <u>contradiction</u> to the selective evidence presented by Stonebridge.  (*See, e.g.,*

18  Def.'s Opp. at 7 ("to the extent that Stonebridge could have negotiated any right to direct how in-bound

19  calls were generated, Stonebridge had no such right if that right did not appear in the agreement.")).  And

20  Trifecta's liability is even more certain—Trifecta contracted directly with transmitters of text message

21  spam, and also controlled the content of the text messages. (Rubenbauer Dep. 93:16-24; 114:9-15.)

22  Stonebridge's merits-based arguments are premature, and, ultimately, fail to show that Class Certification is

23  unwarranted.

24  **II.    Common Questions Predominate Over Individual Issues**

25        Notably, Stonebridge does not contend that Plaintiff has failed to satisfy the commonality prong of

26  Rule 23.  Instead, Stonebridge attacks the predominance prong, arguing that its liability requires

27  individualized issues of proof.  But as stated in Plaintiff's opening brief, "Defendants' liability will be

28

---

1   established solely by examining the conduct of the Defendants themselves, not the actions of any Class

2   Members." (Dkt. 69 at 20.)  Stonebridge's arguments that "individual issues" exist over whether each class

3   member called the toll-free number or were pitched Stonebridge products miss the mark entirely.

4   Violations of the TCPA do not depend on consumers responding to text message solicitations, purchasing

5   Defendant's products, or even expressing interest in them.  As the Supreme Court explained, the TCPA

6   prohibits "the use of an automatic telephone dialing system . . . to call any cellular telephone[.]"  *Mims v.*

7   *Arrow Financial Services, Inc.*, 123 S. Ct. 740, 745 (2012).  A violation of the TCPA is complete upon the

8   transmission of the offending text messages.  *Hinman v. M&M Rental Center, Inc.*, 596 F. Supp. 2d 1152,

9   1158-59 (N.D. Ill. 2009).  The predominance test under Rule 23 is based around the underlying cause of

10  action.  *Erica P. John Fund, Inc. v. Halliburton*, 131 S. Ct. 2179, 2184 (2011).  Therefore, Defendants'

11  liability will be established if they (1) made a call (or can be held vicariously liable for making a call) (2)

12  using an Automatic Telephone Dialing System ("ATDS").  Both of these questions can, and should, be

13  answered on a class-wide basis.

> **A.      Stonebridge's Liability Is Determined Based on Examination of Its Own Conduct**

14
15          Liability under § 227(b)(3) of the TCPA is established when a person or entity "makes" a call using

16  an ATDS.  *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d. 1165, 1169 (N.D. Cal. 2010).  A party cannot avoid

17  liability by simply hiring another company to transmit text messages.  *In re Jiffy Lube Inter., Inc. Text*

18  *Spam Litig.*, 847 F. Supp. 2d 1253, 1256-57 (S.D. Cal. 2012).  In fact, the Ninth Circuit has implicitly

19  accepted that an entity can be liable under the TCPA even if it "seemed to play no role in physically

20  sending the messages."  *Id.* (citing *Satterfield v. Simon & Schuster*, 569 F.3d 946, 955 (9th Cir. 2009)); *see*

21  *also Kramer*, 759 F. Supp. 2d at 1170 ("courts have held both advertisers and advertisement broadcasters

22  subject to liability under the TCPA.").

23          If an entity did not physically transmit the messages, liability is determined by examination of

24  vicarious liability principles.  *In re Jiffy Lube*, 847 F. Supp. 2d at 1258.[9]  Some of the factors considered are

25

26      [9]  Stonebridge cites to *Thomas v. Taco Bell Corp.*, -- F. Supp. 2d ---, 2012 WL 3047351 (C.D. Cal. June 25,
    2012), for the proposition that Plaintiff must prove that Stonebridge "controlled or had the right to control . . .
27  the manner and means of the text message campaign they conducted."  (Def.'s Opp at 24.)  Notwithstanding the
    fact that *Taco Bell* is currently on appeal to the Ninth Circuit (*see Thomas v. Taco Bell*, No. 09-cv-01097, Dkts.
28  196, 197), the evidence needed to prove vicarious liability is merits-based, and focuses on Stonebridge's right to

1    defendants' level of control over the text message campaign and how much information defendants had

2    about the use of an auto-dialer. *Id.*; *see also Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468, 472

3    (Ga. Ct. App. 2000) (stating that vicarious liability attaches when an entity has the "right to control the time

4    and manner of executing the work.").

5         What is notable about this standard of liability is that it depends solely on the actions of the

6    defendants themselves, not any class members. As such, Stonebridge's (and Trifeca's) liability in this case

7    is dependent on their right to control the text message advertising in this case, as well as their knowledge

8    about the text message campaign. For example, to prove whether Stonebridge is liable for the transmission

9    of these messages, the Court would conduct an inquiry into the following areas: (1) Stonebridge's

10   relationship with Trifecta and other third-parties; (2) Stonebridge's level of knowledge into Trifecta's

11   marketing activities; (3) Stonebridge's right to control Trifecta's advertising methods; and (4) Trifecta's

12   status as an agent or independent contractor to Stonebridge.

13        Whether class members responded to the text messages at issue, including whether they called any

14   telephone number in the text message or purchased any products over the phone, is irrelevant to this

15   analysis, and is irrelevant to the question of whether a TCPA violation occurred, given that the violation

16   was complete as soon as the messages were transmitted. The slight merits discovery already conducted

17   suggests that Stonebridge could control Trifecta's marketing methods. And Trifecta's liability is even less

18   in doubt, as they contracted with the text message marketers and controlled the content of the messages.

19   (Rubenbauer Dep. 93:16-24; 114:13-15.)

20        As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, "what matters to class

21   certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a

22   classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 131 S. Ct

23   control. As set forth in Section I.C above, evidence already elicited suggests that Stonebridge did have such

24   control. (continued on next page)

25        And it is still an open question as to whether "vicarious liability" is the proper standard under the TCPA. The
     FCC has stated that its "rules generally establish that the party on whose behalf a solicitation is made bears
26   ultimate responsibility for any violations." *Rules and Regulations Implementing the Telephone Consumer
     Protection Act of 1991*, Memorandum Opinion and Order, 100 FCC Rec 12391, 12397 ¶ 13 (1995). It reiterated
27   this view in a Request for Clarification and Declaratory Ruling and has stated it again in court filings. *See Brief
     for the Federal Communications Commission and the United States as Amici Curiae, Charvat v. Echostar
     Satellite, LLC*, No. 09-4525, 2010 WL 7325986, at *11 (Oct. 15, 2010).

28

2541, 2551 (2011).  That is precisely the case here.  Defendants' liability can be determined as to all the class members because it depends solely on Defendants' conduct.  After this class is certified, merits discovery can commence that will further establish Defendants' culpability for the text message transmissions here.

**B.     Whether an ATDS Was Utilized in this Case Is a Common Question**

The second element of a TCPA claim is whether Defendants used an ATDS to place the text message calls to the class members.  Stonebridge's opposition brief does not challenge the conclusion that a single computer program was used to transmit these messages.  That this element has been satisfied here cannot reasonably be disputed.  All of the text messages were transmitted from a single telephone number in rapid succession over a short period of time.  (Snyder Decl., ¶ 19; Snyder Dep., 148:23 – 149:14.)  This circumstance demonstrates the use of a single technology (*i.e.* "API") in the transmission of these messages.  (Snyder Decl., ¶¶ 19, 21, 25.)  Stonebridge has not presented any evidence that multiple computer systems were used to transmit these text messages, or that any of these text messages were transmitted manually (indeed, Defendants do not even suggest that a single individual, as opposed to an ATDS, transmitted nearly 60,000 messages just seconds apart over a four-day period.)  Thus, the question of whether this API constituted an ATDS is common to all class members.

**C.     Stonebridge's Argument about "Individualized Issues" of Consent Is a Red Herring**

Stonebridge attempts to argue that issues of consent require individualized inquiries that defeat class certification.  These arguments fall flat in light of the burden of proof regarding consent at the class certification stage, the evidence presented by Plaintiff from the T-Mobile List, and the testimony from Trifecta's President about consent.

First, Stonebridge makes the incredible statement that "[t]he evidence shows that any text messages authorized by Trifecta were collected from various websites through which consumers had first opted-in to receive text messages" despite presenting <u>zero</u> <u>evidence</u> that any of the 59,568 people on the T-Mobile List consented, where they gave their consent, or what that consent language looks like.  Stonebridge makes this suggestion simply by cobbling together irrelevant evidence and plucking a selective quote from the deposition of Randall Snyder.

1    Stonebridge deceptively cites to the statements of Trifecta vendor ModernAd Media (and its

2    successor, Acquinity Interactive), who claimed that it only transmitted text messages to people who

3    consented. (Def.'s Opp. at 20.)  The problem with this testimony, however, is that <u>neither of these</u>

4    <u>companies transmitted the text messages at issue here</u>.  Warren Rustin, President of ModernAd Media,

5    testified that its company only used "shortcodes," not "longcodes" to transmit text messages.  (Deposition

6    Testimony of Warren Rustin ("Rustin Dep."), attached to Ochoa Decl. as Exhibit 7, at ¶ 15, at 44:11-13;

7    45:3-5.)  What makes Stonebridge's use of this evidence especially troubling is that ModernAd ceased

8    doing business with Trifecta (*i.e.*, stopped sending text messages) approximately <u>two weeks before</u> the text

9    messages at issue were transmitted, and never did business with them again.  (Rustin Dep. at 119:3-13.)[10]

10    Stonebridge's problem in this case is that it cannot find evidence of consent.  The reason is simple:

11    There is no consent.  The T-Mobile List itself shows that these phone numbers were not obtained from a

12    list, but rather were generated in sequential and ascending order, then transmitted text messages *en masse*.

13    (Snyder Decl., ¶ 21; Snyder Dep. 167:22 – 173:8.)  Trifecta President Alois Rubenbauer testified that he

14    "didn't know" whether anyone consented to receive text messages.  (Rubenbauer Dep. 106:21 – 107:2.)

15    This evidence demonstrates that the question of consent is an issue capable of class-wide resolution.

16    Stonebridge's hypothetical arguments that someone "may have" signed up for "something" on a website

17    should be given no weight.  In *Meyer v. Portfolio Recovery Associates*, -- F.3d ---, 2012 WL4840814 (9th

18    Cir. Oct. 12, 2012), the Ninth Circuit addressed the effect of a defendant presenting hypothetical arguments

19    in the way Stonebridge does here.  In *Meyer*, the defendant attempted to argue that prior express consent

20    was an individualized issue because class members "might have agreed to be contacted at any telephone

21    number" or class members' phone numbers may have "been obtained via skip-tracing," thus creating

22    individualized issues.  *Id.* at *3.  The Court rejected these arguments, and upheld class certification, stating

---

24    [10]  In addition to citing to irrelevant evidence, Stonebridge takes a snippet of misleading testimony from expert
witness Randall Snyder in response to a hypothetical question and uses it for the proposition that so-called gaps
25    in the T-Mobile List could be caused by "compilations of different lists of numbers." (Def.'s Opp. at 21.)
Snyder, however, immediately explained that "it doesn't make sense" to him that different lists would be used,
26    and that there would be "no logical reason" to do so.  (Snyder Dep. 154:2 – 155:9.)  Rather, Snyder explained
the "most likely reason" for the "regular pattern" of phone numbers in sequential and seemingly random order is
27    that the groups of random numbers are simply numbers being retried because the calls didn't go through during
the first try.  (Snyder Dep. 153:7 – 155:9.)

1   that the defendant could not point to a "single instance" where this may have occurred.  *Id.*  It is the same

2   here—Stonebridge's theories about "multiple opt-in lists" and other sources of consent are pure

3   hypotheticals.

4          Under Stonebridge's logic, a TCPA class of consumers whose telephone numbers were randomly

5   generated could <u>never</u> be certified because you could never be sure if anyone consented.  This argument is

6   absurd, and courts have recognized that plaintiffs do not have the impossible standard of proving a

7   negative.  *See Silbaugh v. Viking Magazine Services*, 278 F.R.D. 389, 394 (N.D. Ohio 2012) ("Having

8   produced no evidence that any individual consented to receive text messages in response to plaintiff's

9   presentation of [defendant's] testimony, defendant is unable to realistically argue that individual issues of

10  consent outweigh commonality."); *see also Am. Home Services, Inc. v. A Fast Sign Co., Inc.*, 287 Ga. App.

11  161, 163, 651 S.E.2d 119, 121 (2007) ("the trial court did not abuse its discretion in rejecting [defendant's]

12  claim that the proposed class failed the commonality requirement based on the hypothetical existence of

13  persons in the class against whom it could assert the existing business relationship exemption.").

14         As *Silbaugh* also points out, the question of which party bears the burden of establishing consent is

15  a common question.  *Id.*  And consent means much more then simply "visiting a website" and providing

16  one's phone number.  Prior express consent is "consent that is unmistakably stated."  *Satterfield v. Simon &*

17  *Schuster*, 569 F.3d 946, 955 (9th Cir. 2009); *see also Thrasher-Lyon v. CCS Comm. LLC*, 2012

18  WL3835089, at *5 (N.D. Ill. Sept. 4, 2012) (finding that "prior express consent" requires express consent

19  to receive <u>automated</u> telephone calls, rather than consent to simply be contacted).  None of this is present

20  here.[11]  Defendants should not be able to avoid class certification by transmitting text messages to

21  randomly generated telephone numbers.  Consent is a common question, and Stonebridge has presented no

---

22         [11]  The cases relied on by Stonebridge are distinguishable on various grounds.  In *Vigus v. S. Ill.*

23  *Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229 (S.D. Ill. 2011), the plaintiff received a prerecorded call
    intended for members of defendant casino's customer loyalty program.  *Id.* at 232.  The problem, however, was

24  that plaintiff was never a member of the loyalty program—his phone number was "recycled," and the previous
    owner was a member of the program.  *Id.*  The court found that determining which numbers were "recycled"

25  presented individual inquiries.  *Id.* at 237.  *Leavitt v. Fax.com* is also distinguishable.  In that case, the Court de-
    certified a class after the fax transmission logs became unavailable and it became impossible to determine, for

26  example, whether numbers were generated by "computers randomly dialing and hunting for fax machines . . ."
    *Leavitt*, 2007 WL 316978, at *4, No. 05-949 (D. Md. May 25, 2007).  The situation here is the exact opposite.

27  Plaintiff <u>has</u> obtained the transmission logs in this case, and they demonstrate the numbers <u>were</u> likely generated
    through random and sequential dialing.

28

---

1    evidence related to the T-Mobile List or the class members suggesting otherwise.

2    **III.    Plaintiff Jessica Lee Satisfies the Typicality and Adequacy Requirements**

3          Throughout this litigation, Plaintiff has repeatedly demonstrated herself to be an exemplary class

4    representative despite harassment by Stonebridge's counsel.[12]  As previously discussed, she contacted an

5    attorney after her receipt of the unsolicited text message and then promptly took steps to preserve the text

6    message at issue.  (*See* § I.B *supra*.)  Lee has reviewed and answered multiple sets of discovery requests,

7    traveled across the country to attend a settlement conference with Magistrate Judge Spero, sat for a

8    deposition, and produced thousands of pages of telephone bills and other documents. (Ochoa Decl.,  ¶¶ 8-

9    11.)  Try as it might, Stonebridge's exaggerations of perceived inconsistencies in Plaintiff's testimony are

10   irrelevant to her actual claims and her ability to represent this class.  *See Greko v. Diesel U.S.A., Inc.*, 277

11   F.R.D. 419, 426-27 (N.D. Cal. 2011); *Imhoff Inv. v. SamMichaels LLC*, No. 10-10996, 2012 WL 4815090,

12   at *3 (E.D. Mich. Oct. 1, 2012).  As such Stonebridge's arguments that Ms. Lee is somehow inadequate are

13   meritless.

14         **A.    An Adverse Inference is Unwarranted in this Situation**

15         Stonebridge speculates that Lee is subject to an adverse inference, but has filed no discovery-related

16   motions.  This alone should end the inquiry, as this is not the proper place to argue a spoliation motion.  *See*

17   *Ferrone v. Onorato,* CIV.A. 05-303, 2007 WL 2973684, at *10-11 (W.D. Pa. Oct. 9, 2007) aff'd, 298 F.

18   App'x 190 (3d Cir. 2008) ("even assuming plaintiff had evidence of alleged spoliation, it was incumbent on

19   him to seek redress through an appropriate discovery motion.")  Regardless, Stonebridge has not and

20   cannot show that the elements necessary to support an adverse inference could be met.[13]  The adverse

21   inference is a drastic remedy reserved only for circumstances involving the willful destruction of relevant

22   evidence, not the accidental loss of a phone, the relevant contents of which—specifically the text message

---

23   [12] Stonebridge served document requests designed to harass and intimidate the Plaintiff.  The documents
24   sought included her state and federal tax returns and all invoices related to her clothing business.  (Ochoa Decl.
     ¶ 12.)  The requests also included a request that Plaintiff turn over her work computer, personal computer, and
25   cellular telephone to Defendant for inspection and copying, as well as any other electronic device she used from
     Janauary 1, 2010 to the present date.  (*Id.*)

26   [13] The adverse inference is a drastic measure, such that even where a moving party can show that all
27   necessary elements have been proven, courts have denied requests "upon concluding that the degree of fault and
     level of prejudice were insufficient to justify imposition of the sanction."  *Apple Inc. v. Samsung Elec. Co., Ltd.*,
     11-CV-01846-LHK, 2012 WL 3627731, at *12 (N.D. Cal. Aug. 21, 2012).

28

1    at issue—have already been preserved.  Stonebridge's contention that plaintiff "failed to preserve the text

2    message she allegedly received" has been shown to be patently wrong.  (*See* § I.B *supra*).

3    Stonebridge has also failed to show that evidence was destroyed "with a culpable state of mind" or

4    that "the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact

5    could find that it would support that claim or defense."  *In re Napster, Inc. Copyright Litig.*, 462 F. Supp.

6    2d 1060, 1078 (N.D. Cal. 2006).  On the contrary, Plaintiff took steps to preserve the content of the text

7    message by forwarding it to Counsel.  (*See* § I.B *supra*).  There is no evidence the phone was "intentionally

8    destroyed", and Stonebridge presents no argument why the actual cell phone is necessary in this case.

9    Stonebridge's argument should be rejected.

10        **B**.    **Plaintiff's Friendship with an Attorney at Plaintiff's Law Firm Is Insufficient to
              Render Her Inadequate**

11       There is nothing improper about a person seeking counsel with a friend who is a lawyer, whether in

12    the class certification context or otherwise.  Stonebridge's attempt to characterize the friendship between

13    Plaintiff Lee and an attorney at Edelson McGuire—uninvolved with the litigation of this case—into a

14    relationship that would affect her ability to represent the class overdramatizes their relationship[14] and

15    nonetheless remains insufficient to support a claim of inadequacy.

16       Notably, the cases Stonebridge relies upon to support its contention are clearly distinguishable

17    because they involve relationships with financial ties—something that is not present in this case.  *See Serna*

18    *v. Big A Drug Stores, Inc.*, 2007 U.S. Dist. LEXIS 82023, at *6 (C.D. Cal. Oct. 9, 2007) (class

19    representative was deemed inadequate given her status an *employee* of class counsel for nearly *forty years*);

20    *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003) (class representative was found

21    inadequate because, as class counsel's stock broker, he had both a close friendship *and* business

22    relationship with class counsel).  Lee has never had financial ties with Mr. Givens, nor entered into any

23    business relationship with him.

24       Instead, *Kesler v. IKEA*, SACV 07-568 JVS RNBX, 2008 WL 413268 (C.D. Cal. Feb. 4, 2008) is

25    _____

26    [14] Stonebridge makes much over the number of calls and text messages exchanged between Lee and Givens
      over a three-year period, and suggests that Lee was being evasive in her answers about her contact with Mr.
27    Givens.  Lee's testimony was that she communicates with Mr. Givens "every couple weeks," which is in no way
      inconsistent with the number of communications.  (Lee Dep. 121:5-10.)  Regardless, Stonebridge cites to no
28    authority that suggests the frequency of communications has any bearing on adequacy.

---

1  more in line with the facts of this case.  There the class representative had a close friendship with an

2  attorney of the firm that represented her, but was still found to be an adequate class representative.  *Id.* at

3  *5.  In fact, the class representative had been friends with the attorney since the fourth grade.  *Id.*  Similarly,

4  Lee has been friends with Chandler Givens, an attorney at Edelson McGuire, since the second grade.  They,

5  too, went to school together and regularly communicate.[15]  Further, like the defendant in *Kesler,*

6  "[Stonebridge] does not cite any authority that extends the rule beyond familial and business relationships

7  to mere friendships."  *Id.* at *5.  Accordingly, Lee's friendship with Givens does not prevent her from being

8  an adequate class representative.  Indeed, there is absolutely nothing improper with an individual reaching

9  out to a friend for legal assistance.

10         Stonebridge tested Ms. Lee as to her possible financial motivations in bringing this lawsuit, and she

11  easily passed this test, demonstrating that she had no financial interests at odds with any class member.

12  (Lee Dep. 87:12 – 88:10.)  There is <u>no evidence</u> that Plaintiff has any underlying financial motivations in

13  this case that would compromise her ability to represent the class.  Lee is not only an adequate class

14  representative, she has embraced her duties as class representative.

15  **IV.    Plaintiff's Class Definition is Proper**

16         Plaintiff's proposed class is properly defined and meets the numerosity requirement of Rule 23.

17  "An identifiable class exists if its members can be ascertained by reference to objective criteria."  *Herrera*

18  *v. LCS Fin. Services Corp.*, 274 F.R.D. 666, 672-73 (N.D. Cal. 2011).  A class description need only be

19  "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a

20  member."  *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291, 299 (N.D. Cal. 2010) (quoting

21  *O'Connor v. Boeing N. Am. Inc.,* 184 F.R.D. 311, 319 (C.D. Cal. 1998)).  Because a TCPA violation is

22  complete upon transmission of the offending text message, the class properly includes all 59,568

23  individuals on the T-Mobile List.  Further, the class is identifiable based on objective criteria—namely the

24  T-Mobile List.  Records in the possession of cellular telephone carriers will allow Plaintiff to obtain contact

25

26      [15]  Further, in *Kesler* the attorney was not appointed class counsel.  Similarly Mr. Givens is not seeking to be
appointed class counsel here and has not even been involved in the day-to-day litigation of this matter.  *Id.*  In

27  addition, the class representative in *Kesler* approached the attorney just as Lee approached Mr. Givens here.
(*See* Lee. Dep. at 119:11-20.)

28

1   information for the class.

2       Turning to Stonebridge's own proffered authority on the subject of class definitions, "[G]eneral

3   outlines of the membership of the class are all that are required for Rule 23[.]" *O'Connor*, 180 F.R.D. at

4   368 (quotations omitted.)  All that is required is that Plaintiff's class definition has "some relation to the

5   Defendants' activities." *Id.*  The plaintiffs in *O'Connor* failed to define a certifiable class because their

6   class definition rested on the dispersion of hazardous substances across a "contamination area" defined by

7   geographical boundaries, but the plaintiffs there could not show that the hazardous substances permeated

8   all of the "contaminated area."  Likewise, the plaintiffs in *Kemblesville HHMO Ctr., LLC v. Landhope*

9   *Realty Co.*, also failed to demonstrate a certifiable class where the alleged dispersal of hazardous materials

10   permeated an undefined geographical area.  CIV.A. 08-2405, 2011 WL 3240779 (E.D. Pa. July 28, 2011).

11       This case is considerably different than *O'Connor* and *Kemblesville* because of the obvious

12   difference between transmission of unsolicited text messages versus the dispersal of hazardous waste.

13   Here, the TCPA violation was complete when each class member was sent the unsolicited text message.

14   Stonebridge's arguments about who actually called the number, or which people were offered Stonebridge

15   products, are irrelevant to a TCPA violation.[16]  And as explained in Section I.C *supra*, the T-Mobile List is

16   sufficiently tied to Defendants' conduct for purposes of class certification.

17       Though Stonebridge contends that a proper class definition must "explicitly tie the challenged calls

18   to the defendant," the fact is that no authority exists to support such a contention. All the law requires is for

19   a class definition to allow for class members to be ascertained "by reference to objective criteria." *Herrera*,

20   274 F.R.D. at 672-73.  Here, Plaintiff's class definition allows for just that—the T-Mobile List provides an

21   "objective criteria" by which to identify the class.

22                    **CONCLUSION**

23       For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff's Motion for

24   Class Certification.

25

26       [16] Nor is this case akin to the class definition issues presented in *Oshana v. Coca-Cola Co.*  There, the proposed class was deemed overbroad where the action was based on deceptive marketing; while some class

27   members were deceived into buying a soft drink they did not think contained saccharin, others bought the product with knowledge that it did.  472 F.3d 506, 514 (7th Cir. 2006).  No such distinction exists here, as class

28   members' subjective state of mind is not relevant to receipt of an unsolicited text message.

1

2 | Dated:  October 18, 2012

3 | Respectfully Submitted,

4

5 | JESSICA LEE, individually and on behalf of a class of similarly situated individuals

6

7 | BY: /s/  John C. Ochoa
One of Her attorneys

8

9 | Sean Reis (SBN 184044)
Edelson McGuire, LLP

10 | 30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688

11 | Tel: 949.459.2124
Fax: 949.459.2123

12 | sreis@edelson.com

13 | Ryan Andrews (*Pro Hac Vice*)

14 | John C. Ochoa (*Pro Hac Vice*)
Evan M. Meyers (*Pro Hac Vice*)

15 | Bradley Baglien (*Pro Hac Vice*)
Edelson McGuire, LLC

16 | 350 North LaSalle, Suite 1300
Chicago, Illinois 60654

17 | Tel: 312.589.6370

18 | Fax: 312.589.6378
randrews@edelson.com

19 | jochoa@edelson.com
emeyers@edelson.com

20 | bbaglien@edelson.com

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

 I, John C. Ochoa, an attorney, certify that on October 18, 2012, I caused the above and foregoing

3

***Plaintiff's Reply in Support of Her Motion for Class Certification*** to be served on counsel of record by

4

causing true and accurate copies of such paper to be sent via ecf to:

5

6

7

8

9

Tiffany Cheung
TCheung@mofo.com
Dan Edward Marmalefsky
DMarmalefsky@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482

10

*Attorneys for Stonebridge Life Insurance Company*

11

12

13

14

Stuart D. Kirchick
sdkirchick@aol.com
Law Offices of Stuart D. Kirchick
1143 Story Road
Suite 210
San Jose, CA 95122

15

16

17

18

19

20

ALEXANDER EDWARD SKLAVOS
aes@sklavoslaw.com
LAW OFFICES OF ALEXANDER E. SKLAVOS, PC
375 N. Broadway, Suite 208
Jericho, NY 11753
Telephone: 516.248.4000
Facsimile: 516.877.8010

*Attorney for Trifecta Marketing Group LLC*

21

22

23

24

<u>/s/ John C. Ochoa</u>

25

26

27

28